FILED

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

2010 OCT 26  P 3: 08

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ANNE MERCER,<br>118 South Virginia Avenue<br>Falls Church, Va.  22046 | :<br>:<br>: |
| Plaintiff | :<br>: |
| v. | :  Civil Action No. _1: 10 CV 1212_<br>:              GBL/IDD |
| DROHAN MANAGEMENT<br>GROUP, INC.<br>Serve:<br>   William Drohan<br>   Registered Agent<br>   12100 Sunset Hills Rd.<br>   Suite 130<br>   Reston, VA  20190 | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Defendant | :<br>: |

### COMPLAINT
### (Violations of the Americans with Disabilities Act (Retaliation, Unlawful Discharge, and Failure to Reasonably Accommodate))

Plaintiff, ANNE MERCER, by counsel, files this Complaint against Defendant alleging

violations of the Americans with Disabilities Act, and in support thereof states as follows:

1.     Plaintiff, Anne Mercer, was employed by Defendant, Drohan Management Group,

Inc. (hereinafter referred to as "DMG") from March 19, 2007 until she was unlawfully discharged

on February 21, 2008.

2.     DMG is a corporation doing business in the Commonwealth of Virginia with its

principal office located in Fairfax County, Virginia.  It employs approximately 40 employees.

3.     Jurisdiction is based upon alleged violations of the Americans with Disabilities

Act, 42 U.S.C. § 12101-12117, 12203 (2009).

## FACTUAL PREDICATE

4.     DMG manages small, non-profit associations from a centralized office in Virginia. Clients hire DMG to conduct their business at the direction of the Board of Directors. Annual membership meetings and board meetings would be organized, promoted and conducted by DMG. Rather than hire a full-time executive director, the association would use an "account executive" from DMG to serve as the executive director.

5.     At DMG, six account executives were employed to serve as part-time executive directors of the association clients of DMG. Each account executive was responsible for three association clients and carried the title of "executive director" for those clients.

6.     In early 2007, Plaintiff applied for the advertised position of account executive with DMG. With 30 years of hands on experience in association management, combined with a Bachelors of Arts, a Master's Degree, and a Certificate in Finance Administration from the American Society of Association Executives, she was exceptionally well qualified and experienced in all aspects of association management.

7.     Plaintiff was hired for the position with the understanding that she would assume that title and commensurate duties in the near future, when anticipated new business materialized. Until then, she would temporarily serve in an administrative capacity at a salary of $40,000.

8.     After the successful completion of a 90-day probationary period, Plaintiff was promoted to the job for which she was actually hired - account executive, and her salary was raised to $65,000.

9.     At the time of her promotion to account executive Plaintiff's office was moved

2

from a cubicle to a shared space arrangement with Cathy Vail, the Director of Operations.
Plaintiff was assigned her first client and assisted another account executive with a second
client.

10.     By August 2007, Plaintiff had been assigned responsibility for two full time
clients as executive director.

11.     By September 2007 Plaintiff was given a third client and attended a Board
Meeting on September 20 and 21, 2007 in Minnesota.

12.     In November 2007, Plaintiff moved to a private office with a window.

13.     During this period of time, July through December 2007, Plaintiff was given two
new employees who would serve as her support staff in the management of the three associations
which were entrusted to her.  Neither employee had any experience in association management
and 1 of the 2 employees was required to devote 50% of her time to reception duties.

14.     Plaintiff worked hard to manage her clients and train her new hires.  Her work
week extended well beyond 40 hours.

15.     On December 18, 2007, Plaintiff attended her annual, routine OB/GYN check up;
and routine testing was performed. On January 29, 2008 a biopsy was obtained to follow up a
suspicious pap smear from December. The results of the biopsy were not disclosed to the
Plaintiff until February 11, 2008.

16.     As a benefit of their employment, Defendant provided health insurance for its
employees.  Upon information and belief, in the latter part of 2007 and beginning of 2008,
Defendant sought to reduce its health insurance premium costs.

17.     Defendant would later complain that DMG's health insurance rates increased as a

3

result of Plaintiff's claims during her COBRA extension

18.     Representatives of Defendant's insurance company met with the employees on January 16, 2008 to discuss various insurance products, which would be available to the employees starting on March 1, 2008. .

19.     On February 11, 2008 Plaintiff appeared at her doctor's office to receive the results of the January biopsy. She was informed that she had endometrial cancer, in its early stages; and that she would need a hysterectomy immediately in order to prevent metastasis. The hysterectomy was scheduled for March 5, 2008. She was advised that with the surgery and a recuperative period of up to 6 weeks, the prognosis for recovery was good.

20.     Plaintiff told the doctor that she only had 3 weeks worth of leave and that she intended to recuperate for that period of time. The doctor advised her to be careful but did not object to her stated intention.

21.     Plaintiff reported to work after the doctor's appointment and immediately advised the Director of Operations, Cathy Vail, of her diagnosis of endometrial cancer, the need for surgery, and the scheduled date of March 5, 2008.

22.     Later that same day Plaintiff advised William Drohan, the President of DMG, of her diagnosis of endometrial cancer, the need for surgery and the scheduled date of March 5, 2008.

23.     In her conversation with Drohan on  February 11, 2008, Plaintiff requested a reasonable accommodation of 3 weeks of recuperation from the surgery and proposed to return to work on March 26, 2008. Plaintiff had earned 3 weeks of leave at that time and requested that she be able to use it for the recuperative period.

4

24.     Mr. Drohan did not object at that time to the proposal for this reasonable accommodation of three weeks to recover from the required surgery.

25.     At the time, he seemed to be supportive by indicating that his wife had been treated for the same condition.  He gave Plaintiff the name of her doctor with the suggestion that she obtain a "second opinion."  Plaintiff did not obtain a second opinion.

26.     In addition, Mr. Drohan inquired whether or not Plaintiff would need chemotherapy and radiation treatment after the surgery. She advised Mr. Drohan that it would depend upon what was found in the surgery as to whether or not she would need chemotherapy or radiation therapy after the surgery.

27.     Plaintiff expressed concern about an upcoming annual meeting for one of her clients which was scheduled for April and the anticipated negative reaction of the client to her planned absence of three weeks in March.  Mr. Drohan did not respond to her concern.

28.     On February 12, 2008 in the presence of her staff, Mr. Drohan complimented Plaintiff on the manner in which she handled a recent board meeting in Florida.  Drohan's attitude toward Plaintiff soon changed.

29.     On or about February 13 through February 15 Defendant  began interviewing applicants  for the position of account executive.

30.     Soon after her request for an accommodation and notification of the diagnosis, Drohan's attitude towards Plaintiff became distant and hostile.  He told her that she was to keep her diagnosis and need for time off a secret, and was not to disclose it to co-workers or clients until "we figure out what we are going to do."

31.     During this period of time, December 2007 to February 2008, Plaintiff's work load

5

increased substantially in that she was managing the transition of three new clients in addition to her out of town board meetings.

32.  On February 21, 2008, 10 days after Defendant was informed of her cancer diagnosis and request for a 3 week accommodation for recuperation, Plaintiff was discharged for the pretext of having performance issues.  She was accused of providing inadequate leadership for her support staff and a failure to delegate to them.

33.  Before her dismissal on February 21, 2008, Plaintiff had never been advised by Defendant DMG, or any client, or any co-worker, of any performance deficiency.  Not only had Plaintiff never been advised of any performance deficiency during her nearly 12 months at DMG, but she was repeatedly commended for her work performance by its President, William Drohan.

34.  Plaintiff told Mr. Drohan and Ms. Vail that she would need unemployment benefits to survive since she had not been looking for employment.  Ms. Vail responded with a warning that she should not apply for unemployment compensation because she would not qualify for benefits since she was unable to work.

35.  Again, at the termination  meeting, Plaintiff was reminded to keep her diagnosis a secret from clients and employees

36.  Defendant immediately hired another individual to replace Plaintiff in her position as an account executive.  Upon information and belief this individual has no disabling condition.

37.  At all times pertinent hereto, the U.S. Equal Employment Opportunity Commission had entered into a work sharing agreement with the Fairfax County, Virginia Fair Employment Practices Agency, which dual files charges with the EEOC.

38.  Plaintiff filed her charge with the U.S. Employment Opportunity Commission

6

within 300 days of the acts discrimination.

39.     Upon request of the Plaintiff, the Equal Opportunity Employment Commission issued its right to sue letter on July 27, 2010 which was received by Plaintiff on July 29, 2010.

## COUNT I
### (Discriminatory Discharge)

40.     Plaintiff incorporates herein the  preceding paragraphs of this Complaint.

41.     At all times pertinent hereto, Plaintiff was qualified to perform the essential functions of her job.

42.     Plaintiff was, at all times pertinent hereto, fulfilling Defendant's legitimate expectations of her job performance.

43.     Plaintiff was regarded as disabled by Defendant in its mistaken belief that her diagnosis of cancer and resulting prognosis would substantially limit the major life activity of work, to wit: Plaintiff's ability to perform the duties of the job for which she was hired as well as her ability to perform a class of jobs and a broad range of jobs in  various classes in her field, all of which required long hours,  pressure deadlines and extensive travel.

44.     Plaintiff was discharged under circumstances which raise the reasonable inference of unlawful discrimination in violation of the Americans with Disabilities Act.

## COUNT  II
### (Retaliation for Requesting Reasonable Accommodation)

45.     Plaintiff incorporates herein the preceding paragraphs of this Complaint.

46.     Plaintiff engaged in activity protected by the Americans with Disabilities Act when she sought a reasonable accommodation of three weeks leave to recuperate from surgery.

47.     Plaintiff reasonably believed that she was engaged in protected activity under the Americans with Disabilities Act when she sought a reasonable accommodation of three weeks leave to recuperate from surgery.

48.     Ten days after Plaintiff sought the reasonable accommodation, she was discharged from her employment.  The discharge  was causally connected to her request for a reasonable accommodation.

### COUNT III

**(Failure to Grant Plaintiff's Request for a Reasonable Accommodation)**

49.     Plaintiff incorporates herein the preceding paragraphs of this Complaint.

50.     At all times pertinent hereto, Plaintiff was able to perform the essential functions of her job with a reasonable accommodation.

51.     At all times pertinent hereto, Plaintiff fulfilled Defendant's legitimate performance expectations.

52.     Without a reasonable accommodation of the three week recuperative period, Plaintiff would be unable to have the hysterectomy needed to attempt to eradicate the cancer cells from her body.

53.     Without the hysterectomy, her Stage 1 endometrial cancer would metastasize to neighboring vital organs, to include but not limited to, the lymphatic system and the gastro-intestinal tract and if untreated, would lead to death.

54.     With the accommodation of the time off for recuperation, which would allow the surgery to take place, Plaintiff's condition would likely  be cured.

55.     Plaintiff requested a reasonable accommodation of three weeks leave, which she

8

had earned, to recuperate from the curative surgery.

56.     Plaintiff was unlawfully discharged from her employment 10 days after she requested the reasonable accommodation, which became a defacto denial of her request for a reasonable accommodation.

57.     Plaintiff had her hysterectomy on March 5, 2008 and after a period of three weeks of recuperation, was able to resume her normal activities to include a search for employment.

58.     After the recuperative period, Plaintiff has suffered no ill effects from the surgery and her diagnosis of endometrial cancer; however she is monitored on a long-term basis by an oncologist for any potential recurrence or spread of the cancer.

59.     Without the surgery needed to excise the cancer from her body, the deleterious impact of the cancer on Plaintiff's major life activities of normal bodily function would be permanent, long term and progressively morbid.

WHEREFORE, Plaintiff, by counsel moves this Court for the following relief:

a.      All equitable relief as authorized by law to include but not be limited to wage loss from the date of discharge to the commencement of her new employment in the approximate amount of $40,000; and

b.      Punitive and compensatory damages for the intentional violations of the Americans With Disabilities Act in an amount to be proved at trial but not less than the statutory maximum; and

c.      Reasonable attorneys fees and costs as provided by statute; and

d.      Prejudgment interest; and

e.      Such other further relief as justice may require.

## REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury on all of the issues presented by this Complaint.

Respectfully submitted,

DALE EDWIN SANDERS
VSB #17103
218 North Lee Street
Alexandria, VA  22314
(703) 837-1650
Fax:  (703) 837-1620
dalesanders@sanders.org
Counsel for Plaintiff

and

PATRICIA A. SMITH, VSB 26090
LAW OFFICES OF PATRICIA A. SMITH
500 Montgomery Street, Suite 400
Alexandria, Va.  22314
(703) 548-3774
Fax:  (703) 859-7640
pasmithaty@aol.com
Counsel for Plaintiff

10